UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Case No. 13-20465-CIV-O'SULLIVAN

[CONSENT]

EQUAL EMPLOYMENT OPPORTUNITY
COMMISSION,

      Plaintiff,

v.

FLORIDA COMMERCIAL SECURITY
SERVICES, CORP.,

      Defendant.

_____/

## ORDER

THIS MATTER is before the Court on the EEOC's Motion for Summary

Judgment (DE# 22, 1/15/14). On January 31, 2014, parties filed their Joint Consent to

Jurisdiction by a United States Magistrate Judge for Final Disposition (DE# 25,

1/31/14). This matter was referred to the undersigned by the Honorable William M.

Hoeveler, United States District Judge for the Southern District of Florida, pursuant to

28 U.S.C. § 636(b), for the final disposition of the case. See Order of Reference (DE#

27, 2/6/14).

## BACKGROUND

On February 7, 2013, the Equal Employment Opportunity Commission ("EEOC")

filed the instant action against Florida Commercial Security Services, Corp. d/b/a

Florida Construction Security Services (hereinafter "FCSS" or "defendant") under the

Americans with Disabilities Act of 1990, 42 U.S.C. §12101, et seq. ("ADA"), as

amended by the Americans with Disabilities Act Amendments Act of 2008 ("ADAAA"),

Pub. L. No. 110-325, 122 Stat 3553 (2008) and Title I of the Civil Rights Act of 1991, 42

U.S.C. §1981a. See Plaintiff EEOC's Complaint and Demand for Jury Trial (DE# 1,

2/7/13) (hereinafter "Complaint"). The Complaint alleges that the defendant

discriminated against the charging party, Alberto Tarud-saieh, because of his missing

limb and retaliated against him for filing an EEOC Charge of Discrimination. Id. at ¶¶

26-28.[1]

On January 15, 2014, the EEOC filed the instant motion for summary judgment

and a statement of undisputed material facts. See EEOC's Motion for Summary

Judgment (DE# 22, 1/15/14); EEOC's Statement of Undisputed Material Facts (DE# 23,

1/15/14). On February 18, 2014, the defendant filed its response in opposition and a

statement of disputed facts. See Defendant's Statement of Facts for Which There

Exists a Genuine Issue to Be Tried (DE# 31, 2/18/14);[2] Defendant's Response and

Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE#

32, 2/18/14). On February 19, 2014, the defendant filed certain exhibits in support of its

response and in opposition to the summary judgment motion. See Defendant's Notice

of Filing Exhibits in Support of Defendant's Response to Plaintiff's Motion for Summary

---

[1] Some of the parties' filings contain page numbers which do not correspond to the page numbers automatically assigned by the Court's CM/ECF system. When citing the Complaint (DE# 1, 2/7/13), the Court will cite to the paragraph number instead of the page number, when available. With respect to all other documents, the Court will cite to the page numbers automatically assigned by CM/ECF.

[2] Portions of paragraphs 2, 5, 6, and 11 of the Defendant's Statement of Facts for Which There Exists a Genuine Issue to Be Tried (DE# 31, 2/18/14), paragraph 9 of the Affidavit of German Bosque (DE# 33-2, 2/19/14) and paragraph 6 of the Affidavit of Karen S. Smith-Aloisio (DE# 33-3, 2/19/14) have been stricken by this Court in a separate Order.

Judgment (DE# 33, 2/19/14). The EEOC filed a reply on April 28, 2014. See EEOC's

Reply in Support of Motion for Summary Judgment (DE# 39, 4/28/14); EEOC's Reply

Statement of Facts (DE# 40, 4/28/14). This matter is ripe for consideration.

## **FACTS**[3]

### 1.     **The Charging Party**

The charging party, Alberto Tarud-saieh, has suffered a limb loss (right arm)

which qualifies as a physical disability. Mr. Tarud-saieh's disability substantially limits

one or more major life activities, including but not limited to the operation of his

musculoskeletal function. Mr. Tarud-saieh has a prosthetic arm which has some

functioning capabilities – for example, he can grip a cup with his prosthetic arm. Mr.

Tarud-saieh's prosthetic arm is, however, primarily cosmetic, and he does not wear it

on a daily basis. Mr. Tarud-saieh is unaware of any alternative prosthetic arm that

would help him perform more tasks.

Mr. Tarud-saieh lives by himself and can perform a large variety of tasks without

his prosthetic arm. For instance, Mr. Tarud-saieh can: (i) walk and run; (ii) use a

telephone; (iii) write in a notebook; (iv) open and close doors; (v) open and close fences

and gates; (vi) open and close a padlock; (vii) follow another person; (viii) approach a

---

[3] The facts recited in this section are taken from the paragraphs in the EEOC's Statement of Undisputed Material Facts (DE# 23, 1/15/14) which FCSS does not dispute, or the paragraphs for which FCSS generally denies, but fails to provide record evidence in opposition. See Hawthorne v. Baptist Hosp., Inc., No. 3:08cv154/MCR/MD, 2010 WL 716539, at *3 n.6 (N.D. Fla. Feb. 25, 2010) (stating that "a party may not rest on a general denial to oppose a properly supported motion for summary judgment."). The Court has also included the relevant facts contained in the Defendant's Statement of Facts for Which There Exists a Genuine Issue to Be Tried (DE# 31, 2/18/14) which the EEOC does not dispute where they are supported by record evidence and have not been stricken by the Court's prior Order.

suspect; (ix) use pepper spray and (x) load a firearm. Mr. Tarud-saieh is capable of approaching individuals and asking questions, asking them to stop what they are doing and/or asking them to wait until police arrive. Depending on the type and height, Mr. Tarud-saieh can also climb a fence.

Mr. Tarud-saieh has had a valid Florida driver's license since approximately May 2006. He has not been involved in any automobile accidents where he was found to be at fault. Mr. Tarud-saieh cannot use his prosthetic arm to drive. However,  Mr. Tarud-saieh is not required to wear his prosthetic arm while driving. Mr. Tarud-saieh drives on a daily basis without his prosthetic arm and can stop, turn, back up, drive in reverse and drive at the speed limit, including high speeds. He can also make and receive telephone calls while driving his vehicle by placing the telephone on his shoulder.

In approximately January 2010, Mr. Tarud-saieh was licensed as an Unarmed Security Officer and Armed Security Officer by the Florida Department of Agriculture and Consumer Services.

**2.     The Defendant**

German Bosque is the owner and CEO/President of defendant FCSS. He graduated from the police academy in 1992. In 2010, prior to hiring any applicant (including Mr. Tarud-saieh), FCSS did not perform any pre-hiring drug tests, medical screenings, physical fitness tests, physical agility tests or weight lifting tests. FCSS did not have a minimum or maximum age requirement, height requirement, or weight requirement for its applicants. FCSS did not ask applicants about their medical health or prior injuries. FCSS did not ask applicants any questions about their ability to run or

4

climb fences. FCSS also did not ask applicants about their driving record, or check their driver's license history.

For example, FCSS hired Maxene Etienne, a female, unarmed security guard, who was allegedly required to detain shoplifters. FCSS did not, however, conduct any physical fitness test or strength test to determine whether Ms. Etienne could detain a suspect. Mr. Bosque admitted that he did not know whether Ms. Etienne would be able to physically detain a shoplifter. Rather, FCSS simply assumed that she could do it, but FCSS does not know for certain one way or the other. FCSS acknowledged that Ms. Etienne's ability to detain a shoplifter might depend upon the size of the shoplifter, the strength of the shoplifter and the age of the shoplifter.

FCSS has a security guard who is "great and customers ask for her" that is "a little frail and a little old." FCSS has also employed a pregnant security guard. FCSS also employs a deaf person as a "gopher."

**3.      Mr. Tarud-saieh's Hiring**

In approximately July 2010, Mr. Tarud-saieh learned about a job opening for an unarmed security guard position and applied for the position with FCSS.

Liddy Reynolds interviewed Mr. Tarud-saieh for the position. Ms. Reynolds is the Chief Administrative Officer of FCSS. Her job duties include interviewing and hiring applicants. She is also a direct supervisor to the security guards. During Mr. Tarud-saieh's interview, Ms. Reynolds saw his prosthetic arm. Ms. Reynolds told Mr. Bosque that Mr. Tarud-saieh had a prosthetic arm and Mr. Bosque responded that there was no reason not to hire him. According to Ms. Reynolds, she believed Mr. Tarud-saieh's prosthetic arm was "functional," but she did not ask him what he could or

5

could not do with the prosthetic arm. Ms. Reynolds assumed that the prosthetic arm was not for show.

Mr. Bosque did not ask Mr. Tarud-saieh what functions he could do with his prosthetic arm, but believed that Mr. Tarud-saieh had a "prosthetic arm that worked." Mr. Bosque, however, does not know anyone with a prosthetic arm and he has never spoken to anyone with a prosthetic arm about his or her prosthetic arm functions.

FCSS did not condition Mr. Tarud-saieh's job offer on answering medical questions, on passing a medical exam, or on passing a physical agility test. FCSS never asked Mr. Tarud-saieh, either before hiring him or before removing him from his position, any of the following questions: (i) whether or how he could drive; (ii) whether or how he could make telephone calls; (iii) whether or how he could take notes or write a report; (iv) whether or how he could detain a suspect; (v) whether or how he could physically intervene in a violent dispute; (vi) whether or how he could jump a fence; or (vii) whether or how he could handle an emergency situation.

### 4.    The Job Duties of an Unarmed Security Guard

According to Mr. Bosque, the normal protocol for a security guard, when he or she witnesses suspicious activity, is to call the police. A security guard's duties are to call police and be the eyes and ears of law enforcement. FCSS' job description states that, "[d]epending on customers individual needs/requirements, security officers may be required to . . . apprehend/detain violent felon(s) until police arrive." Defendant's Exhibit G (DE# 33-9, 2/19/14).

Once Mr. Tarud-saieh was hired, FCSS instructed him that he was responsible for patrolling a residential community in a security vehicle. He was further instructed to

remain awake and alert, make notes/write reports of any activities and that in the event he witnessed any suspicious happenings, he should call the police and provide a description of the incident. FCSS instructed Mr. Tarud-saieh that he could approach an individual in the residential community to ask what he or she was doing on the premises. FCSS never instructed Mr. Tarud-saieh that he should chase suspects or climb fences. However, Mr. Tarud-saieh understood when he was hired that there may be occasions when he had to follow somebody who was acting suspicious. During his deposition, Mr. Tarud-saieh testified that it was his understanding that physically detaining someone was a requirement of the job. Deposition of Mr. Tarud-saieh (DE# 33-1 at 51-52, 2/19/14).

Mr. Tarud-saieh did not have a Bluetooth telephone headset while he worked for the defendant. Mr. Tarud-saieh was willing to purchase a hands-free, voice-activated cellular telephone, if FCSS had raised concerns about his ability to make and receive telephone calls while driving. FCSS could have accommodated a request by Mr. Tarud-saieh to use a voice activated phone.

FCSS instructed other security guards that they were to observe and report.  For example, FCSS informed unarmed security guard Hilarie Pierre that he was required to keep watch over the property and if he observed an unknown person on the property, he could approach him or her and ask what he or she was doing. FCSS instructed Mr. Pierre, however, not to chase anyone or engage in any kind of confrontation. In the event Mr. Pierre witnessed something suspicious, his instructions were to call the police.

**5.    Mr. Tarud-saieh's First Day on the Job and Subsequent Removal from His Position**

Mr. Tarud-saieh reported for his first day of work on August 2, 2010. Mr. Tarud-saieh did not wear his prosthetic arm to work. He was stationed at Westwind Properties, a residential community. During Mr. Tarud-saieh's first shift, he met the President of Westwind Properties. There was only one fence at Westwind Properties. The fence was a chain link fence that was positioned around a pool. The fence had a gate and Mr. Tarud-saieh was easily able to open and close the gate.

Mr. Tarud-saieh successfully completed his first shift at Westwind Properties without incident. He did not have a single problem performing his job.

On approximately August 3, 2010, Mr. Tarud-saieh spoke with Mr. Bosque on the telephone. During this call, Mr. Bosque told Mr. Tarud-saieh that the President of Westwind Properties did not like him because he does not have two arms. Mr. Bosque removed Mr. Tarud-saieh from the position and told him that he could not return to the position at Westwind Properties.

Mr. Bosque did not ask Mr. Tarud-saieh whether, or how, he could perform the duties of an unarmed security guard. He did not request Mr. Tarud-saieh to perform a physical agility test or ask Mr. Tarud-saieh to demonstrate his driving skills to him or anyone else. Mr. Bosque did not ask Mr. Tarud-saieh to demonstrate his ability to use a cellular phone while driving or to demonstrate his ability to write a report.

**6.    FCSS' Reason For Terminating Mr. Tarud-saieh**

According to FCSS, Mr. Bosque initially believed that Mr. Tarud-saieh's prosthetic arm was a "moving arm/working arm." Following Mr. Tarud-saieh's first day of

work, the President of Westwind Properties called Mr. Bosque. The President of Westwind Properties informed Mr. Bosque that Mr. Tarud-saieh did not wear the prosthetic arm on his first day of work and complained that FCSS "was a joke for sending them a one (1) arm Security Officer."

Mr. Bosque was angry when he learned that Mr. Tarud-saieh did not wear his prosthetic arm to work. Mr. Bosque said to Mr. Tarud-saieh, "What are you, tonto?" (which translates to a "fool"). According to Mr. Bosque, Mr. Tarud-saieh then advised Mr. Bosque that his arm was primarily for cosmetic purposes. According to Mr. Bosque, upon learning that the prosthetic arm was "dead weight," he told Mr. Tarud-saieh: "Well, you can't go back to the post. You can't do the things that they need you to do at that post." According to Mr. Bosque, once he learned Mr. Tarud-saieh had a largely cosmetic arm, he did not need any additional information. During his deposition, Mr. Bosque testified that if Mr. Tarud-saieh had a "movable" prosthetic arm, Mr. Bosque would have given him another chance at the Westwind Properties. Specifically, he would have called up the President of the Westwind Properties and said, "He promises never to leave his arm at home again. You know, if he does he'll get fired. Let's give him a chance." Deposition of German Bosque (DE# 22-3 at 9, 1/15/14).

During discovery, the EEOC asked FCSS to identify "each and every fact that forms the basis of [y]our contention in Paragraph 1 of Defendant's Affirmative Defenses that 'Tarud-saieh was not a qualified individual with a disability within the meaning of the ADA because he was not able to perform the essential functions of his job position with or without a reasonable accommodation.'" FCSS' Answers to Interrogatories (DE# 22-7 at 3, 1/15/14). FCSS responded that "Tarud-saieh showed poor judgment when he

9

failed to wear his prosthetic arm the first day on the job. Poor judgment cannot be accommodated." Id. FCSS did not state that detaining violent suspects, breaking up physical disputes or climbing fences was an essential function of the unarmed security guard position or that Mr. Tarud-saieh could not perform these functions.

The EEOC also asked FCSS to identify "each and every fact that forms the basis of [y]our contention in Paragraph 6 of Defendant's Affirmative Defenses that 'all actions taken by FCSS with regard to Tarud-saieh were taken for legitimate, non-discriminatory reasons unrelated to disability retaliation." FCSS' Answers to Interrogatories (DE# 22-7 at 2, 1/15/14). FCSS responded that Tarud-saieh was fired after he showed poor judgment in not wearing his arm to his first day of work and that Tarud-saieh's post required that he patrol in a vehicle and it would have been difficult or impossible for him to call in a security threat of any kind while driving without a prosthetic limb. Id. at 2-3. FCSS did not state that detaining violent suspects, breaking up physical disputes or climbing fences was an essential function of the unarmed security guard position. Further, FCSS did not state in its discovery response that Mr. Tarud-saieh could not detain violent suspects, break up physical disputes or climb a fence.

**7.   Retaliation Claim**

Mr. Bosque told Mr. Tarud-saieh that he would try to find him another position with FCSS. FCSS never placed Mr. Tarud-saieh into another position. On approximately September 17, 2010, Mr. Tarud-saieh filed a Charge of Discrimination with the Equal Employment Opportunity Commission.

During her deposition, Ms. Reynolds, Chief Administrative Officer of FCSS,

testified as follows:

> Q.      Was Mr. Bosque going to try to find Mr. Tarud Saieh another driving post?
>
> A.      If we get called for another driving post we would have definitely given him a call for another position. We just recently got a position for a driving post, just recently in his area in Kendall.
>
> **Q.      Did you consider calling him?**
>
> **A.      Yes, but obviously he moved forward to the EEOC and said that we were discriminatory against him.** He would have had his opportunity of working for us. Christopher was out of work for maybe a year or more and we called Chris and let Chris know, hey, we have an opening, are you still unemployed? And he said, yes, I would like to take the opportunity. And Chris is now working for us at that post in Kendall. We also called another of our guards and he said he was already working. So that was it.
>
> **Q.      So why didn't you call Mr. Tarud Saieh?**
>
> **A.      Because he was already filing for the EEOC. And we didn't know that we could be in contact with him to offer him the job.** And the last time I researched, I saw him on the Internet with another job. So I don't think he would have accepted a position with us. We didn't have any ill means or will against him so.

Deposition of Liddy Reynolds (DE# 22-4 at 16, 1/15/14) (emphasis added).

During his deposition, Mr. Bosque testified as follows:

> Q.      It's a walking post or a vehicle post?
>
> A.      It's a vehicle post.
>
> **Q.      Was Mr. Tarud Saieh considered for that post?**
>
> **A.      No, he was not.**
>
> Q.      Why not?
>
> **A.      Because I just got that post recently and for the fact that we were in the lawsuit. I don't know if I'm allowed to contact him or not.**

So once this EEOC thing started – because that's a post I would have considered him for.

Q.      Is there something unique about that post that you believe he would have been able to do the work?

A.      Well, if I'm ordered by the EEOC to put him to work, then that's the one that I would consider him for because it's a driving post. There is no backing up, there are no dead end streets, it's just going in circles around the building.

But, again, I still feel that I would still think that he cannot perform what other guards could do if something were to happen.

Deposition of German Bosque (DE# 22-3 at 13, 1/15/14).

**8.     Conciliation**

On August 9, 2012, the EEOC issued a Letter of Determination[4] to FCSS. See Letter of Determination (DE# 33-4, 2/19/14). According to the Letter of Determination, a proposed conciliation agreement was attached to this document. Id. at 2. However, no such agreement was attached. The cause determination explained that the EEOC's investigation indicated the following: "[FCSS] subjected [Mr. Tarud-saieh] to disability discrimination when it removed [Mr. Tarud-saieh] from his position for failure to wear his prosthetic arm on the job, failed to give [Mr. Tarud-saieh] additional assignments, and eventually terminated his employment in retaliation for filing an EEOC charge of discrimination." Id. In that letter, the EEOC further informed FCSS that the EEOC sought to eliminate the alleged unlawful practices by informal methods of conciliation. Id. The EEOC invited FCSS to join with it in reaching a just resolution of the matter. Id.

---

[4] FCSS refers to this letter as a "cause determination." Defendant's Statement of Facts for Which There Exists a Genuine Issue to Be Tried (DE# 31 at ¶16, 2/18/14). It is the same document the EEOC refers to as a "Letter of Determination."

The EEOC asked FCSS to submit a response to the Letter of Determination within fifteen (15) days of receipt of that correspondence. Id. FCSS received the Letter of Determination.

On September 19, 2012, the EEOC wrote to FCSS and informed it that the EEOC had not received a response to the proposed conciliation agreement. See EEOC Letter of September 19, 2012 (DE# 33-5, 2/19/14). The letter also stated that the EEOC needed a response by the due date of September 24, 2012. Id. The EEOC did not wait until September 24, 2012 to fail conciliation. Instead, the EEOC issued a notice to FCSS on September 20, 2012 (the next day) stating that the conciliation process had been unsuccessful. See EEOC Letter of September 20, 2012 (DE# 33-6, 2/19/14).

On that same day, Mr. Bosque sent a letter on behalf of FCSS to the EEOC stating that the company was "willing to engage in settlement discussion," but that he did not want to put Mr. Tarud-saieh back to work unless he was ordered to do so by the EEOC. See FCSS Letter of September 20, 2012 (DE# 33-2 at 4-6, 2/19/14). Mr. Bosque believed that if he had obtained some sort of order from the government, this could help FCSS avoid liability.

In light of FCSS' statement that it was willing to engage in settlement discussions, the EEOC sent another letter and a proposed conciliation agreement (DE# 33-2 at 8-15, 2/19/14) on October 2, 2012[5] stating that the conciliation process would

_____

[5] This letter is dated September 27, 2012, but appears to have been faxed by the EEOC on October 2, 2012. FCSS states that "as may be gleaned from a later letter dated October 18, 2012, the September 27, 2012 letter did not contain a draft conciliation agreement." Defendant's Statement of Facts for Which There Exists a Genuine Issue to Be Tried (DE# 31, 2/18/14). Both the September 27, 2012 letter and the proposed conciliation agreement contain a fax stamp date of October 2, 2012, a

be re-opened to FCSS. The letter provided a response date of October 8, 2012.

Paragraph 5 of the proposed conciliation agreement contained the name of an

individual who was not employed by FCSS. This was a typographical error.

The EEOC followed up with FCSS on October 18, 2012 and noted that the

EEOC had not received a counteroffer from FCSS. See EEOC Letter of October 18,

2012 (DE# 33-8, 2/19/14). The October 18, 2012 letter provided a response date of

October 22, 2012. After receiving no response from FCSS, the EEOC failed conciliation

on November 26, 2013. See EEOC Letter of November 26, 2013 (DE# 22-15, 1/15/14).

## STANDARD OF REVIEW

The Court, in reviewing a motion for summary judgment, is guided by the

standard set forth in Federal Rule of Civil Procedure 56(a), which states, in relevant

part, as follows:

> A party may move for summary judgment, identifying each claim or
> defense--or the part of each claim or defense--on which summary
> judgment is sought. The court shall grant summary judgment if the movant
> shows that there is no genuine dispute as to any material fact and the
> movant is entitled to judgment as a matter of law.

Fed. R. Civ. P. 56(a).

The moving party bears the burden of meeting this exacting standard. Celotex

Corp. v. Catrett, 477 U.S. 317, 322-323 (1986); Adickes v. S.H. Kress & Co., 398 U.S.

144, 157 (1970). That is, "[t]he moving party bears 'the initial responsibility of informing

---

time of 12:10 PM and are marked consecutively as pages 2/10. Moreover importantly,
FCSS does not  present any evidence disputing that it received both documents. At this
juncture in the proceedings, FCSS cannot rely on what may be "gleaned" from the
documents to create a genuine issue of material fact.

the . . . court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact.'" United States v. Four Parcels of Real Prop., 941 F.2d 1428, 1437 (11th Cir. 1991) (quoting Celotex, 477 U.S. at 323).

In assessing whether the moving party has satisfied this burden, the Court is required to view the evidence and all factual inferences arising therefrom in the light most favorable to the non-moving party. Batey v. Stone, 24 F.3d 1330, 1333 (11th Cir. 1994). Summary judgment is appropriate when there is no dispute as to any material fact and only questions of law remain. Reich v. John Alden Life Ins. Co., 126 F.3d 1 (1st Cir. 1997).  If the record presents factual issues, the Court must deny the motion and proceed to trial. Adickes, 398 U.S. at 157; Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

Despite these presumptions in favor of the non-moving party, the Court must be mindful of the purpose of Rule 56 which is to eliminate the needless delay and expense to the parties and to the Court occasioned by an unnecessary trial. Celotex, 477 U.S. at 322-323. Consequently, the non-moving party cannot merely rest upon his or her bare assertions, conclusory allegations, surmises or conjectures.  Id.  As the Supreme Court noted in Celotex:

> [T]he plain language of Rule 56(c) mandates the entry of summary judgment . . . against the party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will bear the burden of proof at trial.  In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial.

Id. at 322-323. Thus, the mere existence of a scintilla of evidence in support of the non-moving party's position is insufficient. There must be evidence on which the jury could reasonably find for the non-movant. Anderson, 477 U.S. at 251; Matsuchita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986).

<u>ANALYSIS</u>

The EEOC alleges causes of action for: (1) employment discrimination in violation of Section 102(a), 42 U.S.C. § 12112(a) and (2) retaliation in response to filing an EEOC Charge of Discrimination in violation of Section 503(a) of the ADA, 42 U.S.C. §12203(a). See Complaint (DE# 1 at ¶¶ 26-28, 2/7/13). The EEOC seeks summary judgment in its favor on the issue of liability and on the defendant's conciliation and third party liability affirmative defenses and asks that the case proceed to trial only on damages. See EEOC's Motion for Summary Judgment (DE# 22 at 6, 1/15/14). The Court will address the EEOC's arguments below.

**1.      Employment Discrimination Claim**

The ADA prohibits employers from "discriminat[ing] against a qualified individual on the basis of [a] disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a).

An ADA plaintiff may prove discrimination through direct evidence or circumstantial evidence. See Wascura v. City of South Miami, 257 F.3d 1238, 1242 (11th Cir. 2001) (stating that "[i]n the absence of direct evidence of discrimination, a plaintiff may establish a prima facie case of an ADA violation through circumstantial

evidence . . . .") (footnote omitted). If a plaintiff seeks to prove his or her case through circumstantial evidence, the burden-shifting framework set forth in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-03 (1973) applies.[6] See Holly v. Clairson Indus., 492 F.3d 1247, 1255 (11th Cir. 2007) (stating that "[t]he burden-shifting analysis of Title VII employment discrimination claims is applicable to ADA claims.") (citation and internal quotation marks omitted).

Because the EEOC does not expressly state in its motion that it seeks to prove its discrimination claim through circumstantial evidence or otherwise engage in the McDonnell Douglas burden shifting analysis, the Court will not apply McDonnell Douglas in ruling on the instant motion. "[I]f direct evidence of discrimination exists, the familiar framework for establishing a prima facie case based on circumstantial evidence and the alternating burdens of production and proof established by McDonnell Douglas . . . do not apply." EEOC v. Am. Tool & Mold, Inc., No. 8:12-cv-2772-T-35EAJ, 2014 WL 2185013, *5 (M.D. Fla. Apr. 16, 2014) (citations omitted). Accordingly, the Court will address the elements of a prima facie case of discrimination without applying McDonnell Douglas.

In order to establish a prima facie case of discrimination, the EEOC must show that the charging party: "(1) had, or was perceived to have, a 'disability;' (2) was a 'qualified' individual; and (3) was discriminated against because of her disability."

_____

[6] Under McDonnell Douglas, the plaintiff must first make a prima facie case of discrimination. If the plaintiff makes a prima facie case, a presumption of discrimination arises and the burden then shifts to the defendant to introduce evidence of a legitimate nondiscriminatory reason for the adverse employment action. If the defendant satisfies its burden, the plaintiff must then show that the articulated reason is pretextual. Lopez v. AT&T, Corp., 457 F. App'x 872, 874 (11th Cir. 2012).

Carruthers v. BSA Adver., Inc., 357 F.3d 1213, 1215 (11th Cir. 2004) (citing Williams v. Motorola, Inc., 303 F.3d 1284, 1290 (11th Cir. 2002)).[7] For the reasons stated below, the Court finds that genuine issues of material fact concerning the second and third element preclude summary judgment in the EEOC's favor.

  **a.  Disability under the ADA**

  In the instant case, Mr. Tarud-saieh has a disability under the ADA as a matter of law. In its response to the EEOC's statement of undisputed facts, FCSS does not dispute that "[Mr.] Tarud-saieh has a physical disability-limb loss (right arm)" and that this "disability substantially limits one or more major life activities, including but not limited to the operation of his musculoskeletal function." See EEOC's Statement of Undisputed Material Facts (DE# 23 at ¶¶ 1-2, 1/15/14); Defendant's Statement of Facts for Which There Exists a Genuine Issue to Be Tried (DE# 31 at 1, 2/18/14) (disputing certain paragraphs, but not paragraphs 1 and 2). The ADA defines "disability" to include: "a physical . . . impairment that substantially limits one or more major life activities of such individual . . . ." 42 U.S.C. § 12102(1). Therefore, Mr. Tarud-saieh has

---

  [7] In its response to the EEOC's summary judgment motion, FCSS restates the elements which the EEOC must prove in the instant case:

> in order to have a claim of disparate treatment based on disability, a plaintiff must prove that: (1) he had a disability; (2) that he was a qualified individual; (3) that the employer subjected the plaintiff to an adverse action; and (4) that the defendant took the action based on the plaintiff's disability.

Defendant's Response and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32, 2/18/14) (citing to 11th Cir. Pattern Jury Instr. (Civ.) 4.11 (2013)). Although the pattern jury instruction divides the elements into four parts, they are the same in substance as the elements enumerated in Carruthers and cited by the EEOC in its motion.

a disability under the ADA. Thus, the first prong of a prima facie case is met.

     **b.**    **Qualified Individual**

     Next, the EEOC must show that Mr. Tarud-saieh is a qualified individual under the ADA. The ADA defines the term "qualified individual" as someone "who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8). The ADA further provides that "consideration shall be given to the employer's judgment as to what functions of a job are essential, and if an employer has prepared a written description before advertising or interviewing applicants for the job, this description shall be considered evidence of the essential functions of the job." Id.

     "Whether a particular job function is essential is 'evaluated on a case-by-case basis by examining a number of factors.'" Samson v. Federal Exp. Corp., 746 F.3d 1200-01 (11th Cir. 2014) (quoting D'Angelo v. ConAgra Foods, Inc., 422 F.3d 1220, 1230 (11th Cir. 2005) (other citations omitted)). An "employer's judgment [as to which functions are essential] is 'entitled to substantial weight in the calculus,'" but it is not conclusive. Id. at 1201 (quoting Holly, 492 F.3d at 1285). In addition to an employer's judgment and any pre-advertising or pre-interview written job descriptions, other factors include: "the amount of time spent on the job performing the function; the consequences of not requiring the employee to perform the function; . . . the work experience of past employees in the job; and the current work experience of employees in similar jobs." Id. (citing 29 C.F.R. § 1630.2(n)(3)(ii)-(vii)).

     The EEOC argues that Mr. Tarud-saieh can perform the essential functions of

the unarmed security guard position at Westwind Properties. EEOC's Motion for
Summary Judgment (DE# 22 at 13, 1/15/14). FCSS maintains that "[t]here is a genuine
issue of material fact as to whether [Mr.] Tarud-[s]aieh can perform in various
emergency scenarios – tracking a fleeing suspect, controlling an unruly child or minor,
detaining intruders and diffusing violent situations." Defendant's Response and
Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32
at 2, 2/18/14). FCSS states that these are essential functions of the job. Id.

### (i)    Following Intruders While Calling Police

The EEOC summarizes the essential functions of the unarmed security guard
job as follows: "(1) driving a vehicle; [and] (2) calling the police/using a cell phone while
driving in order to report suspicious activity." EEOC's Motion for Summary Judgment
(DE# 22 at 12, 1/15/14). The EEOC notes that Mr. Tarud-saieh has a driver's license
and is a licensed security guard in the State of Florida. Id. Additionally, the EEOC states
that to the extent that writing reports is an essential job function, Mr. Tarud-saieh can
write using his one arm. Id. at n.3.

FCSS disputes Mr. Tarud-saieh's ability to "call the police [while] driv[ing] and
follow[ing] a fleeing intruder all at the same time." Defendant's Response and
Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32
at 2, 2/18/14). FCSS notes that Mr. Tarud-saieh "would have to take his hand off the
steering wheel after dialing a number to put it to his ear." Id. In its reply, the EEOC
maintains that Mr. Tarud-saieh can follow a suspect in his car while on the telephone
with police. The EEOC argues that Mr. Tarud-saieh has the ability to perform this task

because he:

> (1) is licensed as a security guard by the State of Florida; (2) has a valid Florida driver's license; (3) can perform all driving functions, including turning, backing up, driving in reverse, and driving the speed limit (including high speeds); and (4) regularly makes and receives telephone calls while driving his vehicle.

EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 3, 4/28/14). The EEOC also disputes FCSS' characterization of the streets at Westwind Properties as having "dead ends, and narrow, curvy streets." Affidavit of German Bosque (DE# 33-2 at ¶8, 2/19/14). The EEOC cites to two photographs of the Westwind Properties complex and argues that they "demonstrate that the streets are fairly typical, and not particularly windy or narrow." EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 3 n.2, 4/28/14).

The Court cannot ascertain the nature of the streets at Westwind Properties from these two, black and white, non-aerial photographs. At best, these photographs create an issue of fact, but do not conclusively refute Mr. Bosque's affidavit on this issue. While Mr. Tarud-saieh may regularly make and receive telephone calls while driving his vehicle, the Court is required to construe the facts in favor of FCSS. Here, the EEOC has not established that Mr. Tarud-saieh could call the police while following a suspect, who would likely be attempting to avoid being followed, while maneuvering the arguably winding and dead end streets of this particular residential complex. Genuine issues of material fact require that this issue be submitted to the jury.

The EEOC further notes that "Mr. Tarud-saieh would have been willing to purchase a hands-free and/or voice activated cellular phone had FCSS ever raised any concerns about his ability to make telephone calls while driving." EEOC's Motion for

Summary Judgment (DE# 22 at 9 n.2, 1/15/14). FCSS responds that "Mr. Tarud-[s]aieh does not have a Bluetooth headset . . . . [and s]ince this is not a failure to accommodate case, there is no claim that [FCSS] failed to reasonably accommodate [Mr.] Tarud-[s]aieh. It is undisputed that [Mr.] Tarud-[s]aieh never asked for any type of reasonable accommodation." Defendant's Response and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32 at 2, 2/18/14). The EEOC responds that "FCSS's assertions are nothing more than a red herring, as Mr. Tarud-saieh did not need an accommodation" because "[he] was willing to personally purchase a hands free voice activated phone – readily available technology – had FCSS ever informed him that his use of the telephone was a concern." See EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 4 n.4, 4/28/14). Assuming, for summary judgment purposes, that a hands free voice activated phone would have allowed Mr. Tarud-saieh to follow suspects while calling police, the Court does not need to decide this issue on summary judgment because there are still genuine issues of material fact concerning the essential job functions of an unarmed security guard for the reasons discussed below.

**(ii)   Detaining Suspects and/or Breaking Up Violent Disputes**

The EEOC further argues that detaining suspects and/or breaking up violent disputes are not essential functions of the job. EEOC's Motion for Summary Judgment (DE# 22 at 13-16, 1/15/14).[8] Alternatively, the EEOC argues that if these are essential

---

[8] The EEOC also lists climbing fences. EEOC's Motion for Summary Judgment (DE# 22 at 16, 1/15/14). However, FCSS does not mention climbing fences as an essential job function. Therefore, the Court concludes that it is not an essential job function.

job functions, Mr. Tarud-saieh can perform these tasks. Id.

FCSS cites to the following as evidence that detaining intruders was an essential function of the unarmed security guard position: (1) the deposition testimony of Mr. Bosque;[9] Mr. Tarud-saieh deposition testimony "that he understood when he took the job with [FCSS] that it require[d] that he physically detain somebody if necessary" and the written job description for this position (DE# 33-9, 2/19/14). Defendant's Response and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32 at 3-4, 2/18/14).

During his deposition, Mr. Bosque testified that there were situations where security guards were expected to restrain someone:

> Q.      I guess I'm trying to understand when a person would be required or when they would be required to sort of engage in a situation where they may be needed to restrain somebody.
>
> A.      Some neighbors fighting, a husband beating a wife outside, domestic violence, abusing a child or something, where you just can't stand back and wait for the police to get there, you have to intervene.

Deposition of German Bosque (DE# 22-2 at 26, 1/15/14).

The EEOC argues that FCSS "mischaracterizes Mr. Tarud-saieh's deposition testimony." EEOC's Reply Statement of Facts (DE# 40 at 6, 4/28/14). At deposition, Mr. Tarud-saieh testified as follows:

---

[9] As noted above, the Court has stricken parts of Defendant's Statement of Facts for Which There Exists a Genuine Issue to Be Tried (DE# 31, 2/18/14) including the deposition testimony of Mr. Bosque to the extent he seeks to testify as to what Mr. Tarud-saieh can and cannot do and to the extent it impermissibly seeks to introduce expert testimony in the form of lay opinion testimony based on Mr. Bosque's police training and experience. However, to the extent this testimony establishes the tasks of an unarmed security guard, the Court will not disregard this evidence.

Q.      Was it your understanding that you might have to detain somebody physically as part of your job at FCSS?

A.      Usually the officers, the guards never confront anybody. If we see something dangerous, we call the police.

***

Q.      Was it your understanding there might be occasions while working for FCSS that you would have to physically detain somebody who was acting in a suspicion or inappropriate manner?

A.      Yes, if it happened to me I would confront the guy and call the police.

Q.      Okay.

A.      I never had that problem.

Q.      I understand that.

**Was it your understanding that part of the job required you if needed to physically detain somebody yourself which means going beyond just calling the police?**

**A.      Okay.**

**Q.      Yes?**

**A.      Yes.**

**Q.      That was your understanding?**

**A.      Yes, that was my understanding.**

Q.      Did you have any concerns about your ability to physically detain somebody who was acting in a belligerent manner?

A.      Yes, but never hold anybody with your arms, never. Not even if I had two arms, never hold anybody. You talk to the person, if the person doesn't obey you, you call the police.

Q.      Okay.

24

        A.      But never hold anybody.

Deposition of Mr. Tarud-saieh (DE# 33-1 at 51-52, 2/19/14) (emphasis added). Thus,

Mr. Tarud-saieh did testify that it was his understanding that physically detaining

someone was a requirement of the job.

      Moreover, the written job description cited by FCSS as evidence that detaining

intruders is an essential job function states:

      **ARMED OR UNARMED, UNIFORMED POSITION**

                              \*\*\*

      DEPENDING ON CUSTOMERS INDIVIDUAL
      NEEDS/REQUIREMENTS, SECURITY OFFICERS MAY BE
      REQUIRED TO:

                                \*\*\*

      • APPREHEND/DETAIN VIOLENT FELON(S) UNTIL
      POLICE ARRIVE

Defendant's Exhibit G (DE# 33-9, 2/19/14) (capitalization and emphasis in original). The

EEOC argues that:

      While generally a position description should be afforded consideration,
      the position description in this case applies generally to all FCSS security
      guards, both *armed or unarmed*, and simply states that "*depending upon*
      *customers individual needs/requirements,* security officers *may be*
      *required* to *apprehend/detain violent felon(s)* until police arrive. (Ex. 23-6
      (emphasis added)). On its face, the position description is nothing more
      than a list of tasks that all security officers, armed or unarmed, might have
      to perform, depending upon the client.

EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 5, 4/28/14)

(emphasis in original). The written job description, while not conclusive, is evidence

suggestive of an issue of fact that should be resolved by the jury and not the Court on

summary judgment.

The EEOC further notes that Liddy Reynolds, Chief Administrative Officer of FCSS, did not include detaining suspects among the possible tasks of Mr. Tarud-saieh's job responsibilities. EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 5, 4/28/14). While Ms. Reynolds may have omitted the task of detaining suspects from her list of job responsibilities, Mr. Tarud-saieh testified that it was his understanding that physically detaining someone was part of the job requirements, see supra. Similarly, Mr. Bosque testified that there were instances where an unarmed security guard was expected to intervene and break up a dispute.

As evidence that detaining someone is not an essential function of the job, the EEOC notes that "security guards at FCSS do not actually spend their time detaining suspects." EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 6, 4/28/14); see also id. at 7 (noting that "[Mr.] Bosque admitted during his deposition that, for the years 2010-2013, he could only recall one unarmed security officer that had to detain a suspicious person, and in that instance, he did not believe the officer had to physically restrain the individual."). However, the amount of time spent performing the job function is only one factor the Court should consider in determining the essential job functions. The nature of an emergency situation is that it generally does not occur regularly. Unless Mr. Tarud-saieh was posted in a high crime area, it is unlikely that he would have confronted suspects on a regular basis. Moreover, the fact that it is not a regular occurrence does not mean it is not an important task of an unarmed security guard.

The EEOC also notes that "[w]hen asked specifically about Mr. Tarud-saieh's

26

position . . . [Mr.] Bosque did *not* state that physically detaining suspects or children

was a job requirement." EEOC's Reply in Support of Motion for Summary Judgment

(DE# 39 at 6, 4/28/14) (emphasis in original). During his deposition, Mr. Bosque

testified as follows:

> Q.      Okay. And it was his job responsibility to –  well, what were his job
> responsibilities at the Westwind Properties?
>
> A.      He had to, he had to write a daily report. He had to patrol the
> property. He had to also park the car and go out on foot in between the
> properties, in between the yards. He had to keep trespassers, unwanted
> visitors -- there was a family there that kept on having police problems,
> police intervention with juveniles smoking marijuana, unwelcome or
> jumping the fence during closed hours when the pool was closed. He had
> to deter criminal activity from happening. One time rims were stolen off a
> car while my guards were there. And like the daytime guard, if any kids
> were wandering around or cutting through, he wouldn't allow them to. He
> would shoo them away, and he had to go like around the property, not to
> go through the property. That was the daytime guard security guard. And
> other stuff, I'm sure, but that's what I can recall.
>
> Q.      If there was a problem at the property, what was he required to do?
>
> A.      Well, if there is a problem, you have to, you know, address it, don't
> ignore it and do what you can, and follow the person, follow the suspicious
> car that's driving around, follow -- one time we had an incident where
> somebody like jumped out of a car, they walked in between the houses,
> and the guard had to follow. He didn't know whether to follow the car, the
> house -- and then I couldn't even tell you what he did. But I remember that
> incident. You know, take action, try to get a tag, **do something, approach
> the person with your flashlight, see what they are doing if you can. If
> they are hurting somebody, then you need to step in. You can't just
> stand back and call police. You do at all times, unless somebody is
> being hurt physically, then you have to. You just can't stand around.** I
> use the example of a video that everybody has seen on TV where security
> guards were standing on the platform and somebody was getting beat up,
> and guards just stood there, like, you know, waiting for police to come.
> Like that's not enough. The place was sued, the security company. **You
> have to step in. You got to separate.** That's what your job is. You know,
> you have to protect life.

Deposition of German Bosque (DE# 22-2 at 14, 1/15/14) (emphasis added). Thus, Mr. Bosque's testimony suggests that there are instances where an unarmed security guard was expected to intervene in a dispute.

The EEOC also notes that FCSS did not perform any tests on its applicants before hiring them and argues that "if physically detaining suspects/breaking up violent disputes were requirements of the unarmed security job position, one would think that FCSS would perform some type of physical agility test, medical background check, or other evaluation to determine if the persons it hires can perform such tasks." EEOC's Motion for Summary Judgment (DE# 22 at 14, 1/15/14). This argument is better suited for cross-examination because it calls into question the truthfulness of FCSS' position that detaining suspects is an essential job requirement.

Finally, the EEOC notes that FCSS instructed another security guard not to chase anyone or engage in any kind of confrontation and that if he witnessed something suspicious, he was to call the police. EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 7, 4/28/14) (citing EEOC's Statement of Undisputed Material Facts (DE# 23 at ¶41, 1/15/14)). Again, this is one of several factors in determining whether a particular task is an essential job function.

At best, the evidence outlined by the EEOC creates a genuine issue of material fact concerning whether detaining suspects and/or breaking up violent disputes were essential functions of the unarmed security guard post. In Samson v. Federal Exp. Corp., 746 F.3d 1200-01 (11th Cir. 2014), the Eleventh Circuit reversed the district court's order granting summary judgment in favor of the employer where some factors weighed in favor of finding that test-driving was an essential function of a vehicle

28

technician position, while other factors did not. Id. at 1201-02. The Eleventh Circuit concluded that "reasonable jurors could differ as to whether test-driving . . . trucks [wa]s an essential function of the [t]echnician position" and "therefore, [the issue] should not have been taken away from the jury and resolved as a matter of law." Similarly here, the Court concludes that there is a factual dispute concerning whether detaining suspects and/or breaking up violent disputes were essential functions of the unarmed security guard job. See also Keith v. Cnty. of Oakland, 703 F.3d 918, 926 (6th Cir. 2013) ("Whether a job function is essential is a question of fact that is typically not suitable for resolution on a motion for summary judgment."). Based on this record and construing the facts in the light most favorable to FCSS, the jury should determine whether detaining suspects and/or breaking up violent disputes are essential job functions of an unarmed security guard.

### (iii)   Whether Mr. Tarud-saieh Could Detain Suspects And/Or Breaking up Violent Disputes

The EEOC further argues that even assuming that detaining suspects is an essential job requirement, Mr. Tarud-saieh could perform this task. See EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 7, 4/28/14). According to the EEOC, Mr. Tarud-saieh could detain a suspect by asking them to wait for police to arrive and by using pepper spray. Id. The EEOC notes that "FCSS security guards are undoubtedly permitted to use pepper spray, and thus no accommodation was required." Id. at 8 n.6.

Again, the Court finds that genuine issues of material fact preclude summary judgment on whether Mr. Tarud-saieh could detain suspects and/or breaking up violent

disputes. The fact that the parties dispute the effectiveness of the methods proposed by the EEOC, suggests that the issue should be left to the jury. See EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 7, 4/28/14) (stating that "it appears that FCSS would like the Court to believe that unarmed security guards, purportedly making $8.00 per hour, are like police officers on a television show, required to engage in high speed chases and hand to hand combat with dangerous suspects."); Defendant's Response and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32 at 4, 2/18/14) (stating that "[t]he unrealistic nature of Plaintiff's contention that [Mr.] Tarud-Saieh can detain suspects by questioning them and then asking if they could stick around until the police arrive seems to be a clear concession that he could not perform this essential function of the position at issue.").

In sum, the Court concludes that there are genuine issues of material fact concerning the essential functions of an unarmed security guard and whether Mr. Tarud-saieh could perform those essential job functions. As such, whether Mr. Tarud-saieh is a qualified individual must be decided by the jury.

### c.      Disability Based Discrimination

Even assuming that there are no genuine issue of material fact precluding the EEOC from establishing that Mr. Tarud-saieh is a qualified individual, the EEOC must also show that FCSS discriminated against Mr. Tarud-saieh on the basis of his disability. See Duble v. Fedex Ground Package Sys., Inc., No. 13-12749, 2014 WL 3631905, at *5 (11th Cir. Jul. 24, 2014) ("To establish the third prong, the plaintiff must

show the employer discriminated against him on the basis of his disability.") (Holly, 492 F.3d at 1261-62).

FCSS argues that it is entitled to the "same actor" inference. Defendant's Response and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32 at 1-2, 2/18/14). The same actor inference has been described as follows: "where . . . 'the hirer and the firer are the same individual and the termination of employment occurs within a relatively short time span following the hiring, a strong inference exists that discrimination was not a determining factor for the adverse action taken by the employer.'" Dingman v. Delta Health Group, Inc., 26 F. Supp. 2d 1349, 1354 (S.D. Fla. 1998) (Proud v. Stone, 945 F.2d 796, 797 (4th Cir.1991)). Dingman was an age discrimination case brought under the Age Discrimination in Employment Act of 1967 ("ADEA"). Id. at 1350. The EEOC argues that "[t]he same actor inference . . . is not generally applicable in the context of the ADA." EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 2, 4/28/14). According to the EEOC, "the same actor inference can only be applied in situations where the individual who hired the disabled applicant had full knowledge of the disability." Id. The EEOC reasons that FCSS did not have full knowledge of Mr. Tarud-saieh's disability because Mr. Bosque and Ms. Reynolds were both under the mistaken belief that Mr. Tarud-saieh's prosthetic arm was a functioning prosthetic arm, and not merely cosmetic. Id. at 3.

In Williams v. Vitro Servs., 144 F.3d 1438, 1440 (11th Cir. 1998), the Eleventh Circuit addressed the same actor inference in the context of an ADEA case. The Eleventh Circuit stated that: "it is important to reiterate that this inference is a permissible – not a mandatory – inference that a jury may make in deciding whether

intentional discrimination motivated the employer's conduct." Id. at 1443. In Williams, the Eleventh Circuit reversed the district court's order granting summary judgment in favor of the employer. The Eleventh Circuit "conclude[d] that [the employer] demonstrated that the same actor at [the company] was primarily responsible for hiring, promoting, and firing [the plaintiff]; this "same actor" evidence, however, **constitutes evidence from which a jury – not the court – is permitted to infer that [the employer] terminated [the plaintiff] for non-discriminatory reasons**." Id. at 1446 (emphasis added).

Similarly here, the Court will not apply the same actor inference on summary judgment in the instant case. FCSS is free to argue at trial that it did not discriminate against Mr. Tarud-saieh because the same individuals who hired Mr. Tarud-saieh also terminated him within a short period of time. As the Eleventh Circuit explained in Williams:

> "same actor" evidence of the sort introduced in this instance constitutes **evidence that a jury may consider in deciding the ultimate issue of intentional discrimination**. Evidence that the same actor both hired and fired the plaintiff, in some circumstances, may help to convince a jury that the defendant's proffered legitimate reasons for its decision are worthy of belief; **it is the province of the jury rather than the court, however, to determine whether the inference generated by "same actor" evidence is strong enough to outweigh a plaintiff's evidence of pretext**.

Williams, 144 F.3d at 1443 (footnote omitted; emphasis added). In the instant case, the jury, not the Court, should draw the appropriate inference from FCSS' actions in hiring and terminating Mr. Tarud-saieh.

The EEOC argues that the Court should find as a matter of law that FCSS discriminated against Mr. Tarud-saieh on the basis of his disability because Mr. Bosque

told Mr. Tarud-saieh: "Well, you can't go back to the post. You can't do the things that they need you to do at that post," once he learned that Mr. Tarud-saieh's prosthetic arm was a non-functioning arm. EEOC's Motion for Summary Judgment (DE# 22 at 17, 1/15/14). The EEOC also cites to Mr. Bosque's deposition testimony to show that he terminated Mr. Tarud-saieh without inquiring whether he could drive with one arm, talk on the telephone while driving, use a hand-free telephone device, could take notes with one arm or jump over or "shut" a fence. Id. "Under Eleventh Circuit law, only the most blatant remarks, whose intent could mean nothing other than to discriminate on the basis of some impermissible factor constitute direct evidence of discrimination." Dixon v. The Hallmark Cos., Inc., 627 F. 3d 849, 854 (11th Cir. 2010) (Title VII case)[10] (internal quotation marks omitted). The EEOC has not met its burden of showing intentional discrimination as a matter of law.

Because there are genuine issues of material fact concerning: (1) the essential functions of an unarmed security guard; (2) whether Mr. Tarud-saieh could perform those essential functions and (3) whether FCSS' discriminated against Mr. Tarud-saieh on the basis of his disability, the EEOC is not entitled to summary judgment on its discrimination claim.[11]

---

[10] The Eleventh Circuit has stated that it "appl[ies] the law developed in Title VII, ADEA, and ADA cases interchangeably." Bass v. Lockheed Martin Corp., 287 F. App'x 808, 810 (11th Cir. 2008).

[11] The EEOC also argues that FCSS cannot show Mr. Tarud-saieh is a direct threat to himself or others. See EEOC's Motion for Summary Judgment (DE# 22 at 18, 1/15/14). FCSS did not address this argument in its response to the summary judgment motion. Therefore, the Court will deem FCSS' position that Mr. Tarud-saieh is a direct threat to himself or others abandoned. See Great S. Wood Pres., Inc. v. Am. Home Assur. Co., 505 F. Supp. 2d 1287, 1297 (M.D. Ala. 2007) (stating that "[t]he burden is

2.      **Retaliation Claim**

The EEOC also seeks summary judgment on its retaliation claim. The ADA states that "[n]o person shall discriminate against any individual because such individual has opposed any act or practice made unlawful by this chapter or because such individual made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this chapter." 42 U.S.C. § 12203(a). Retaliation under the ADA may be proved through direct or circumstantial evidence. See Dickey v. Dollar Gen. Corp., 351 F. App'x 389, 392 (11th Cir. 2009) (stating that "[a] plaintiff can establish a retaliation claim through either direct or circumstantial evidence"). Here, the EEOC argues that there is direct evidence of retaliation, see EEOC's Motion for Summary Judgment (DE# 22 at 20-21, 1/15/14), therefore the Court will not apply the McDonnell Douglas burden-shifting analysis to the EEOC's retaliation claim.

The EEOC argues that FCSS retaliated against Mr. Tarud-saieh by refusing to reassign him to a different job post. See EEOC's Motion for Summary Judgment (DE# 22 at 5, 1/15/14). "To establish a prima facie case for retaliation under the ADA, the plaintiff must show '(1) he engaged in a statutorily protected expression; (2) he suffered an adverse employment action; and (3) there was a causal link between the adverse action and his protected expression.'" Duble v. Fedex Ground Package Sys., Inc., No. 13-12749, 2014 WL 3631905, at *6 (11th Cir. Jul. 24, 2014) (quoting Lucas v. W.W.

———————————————

on the parties to formulate arguments, and a plaintiff's failure to list an enumerated claim and brief an issue in a memorandum of law in opposition to a defendant's motion for summary judgment is deemed an abandonment of that claim."), aff'd on other grounds, 292 F. App'x 8 (11th Cir. 2008).

Grainger, Inc., 257 F.3d 1249, 1260 (11th Cir. 2001). According to the EEOC, the first two elements are readily met in the instant case because "Mr. Tarud-saieh engaged in statutorily protected activities by filing a charge of discrimination and by participating in this lawsuit" and FCSS "failed to assign him to, among other positions, an unarmed driving post in Kendall." EEOC's Motion for Summary Judgment (DE# 22 at 20, 1/15/14). In its response to the EEOC's summary judgment motion, FCSS does not address the first two elements of a retaliation claim. Therefore, the Court will deem these two elements admitted.

At issue is the third element: whether there was a causal link between FCSS' failure to assign Mr. Tarud-saieh to another job post and Mr. Tarud-saieh's protected activities. The EEOC argues that Ms. Reynolds' deposition testimony is direct evidence that FCSS' decision not to assign Mr. Tarud-saieh to the Kendall driving position was retaliatory. EEOC's Motion for Summary Judgment (DE# 22 at 20, 1/15/14). During her deposition, Ms. Reynolds testified as follows:

> Q.     Was Mr. Bosque going to try to find Mr. Tarud Saieh another driving post?
>
> A.     If we get called for another driving post we would have definitely given him a call for another position. We just recently got a position for a driving post, just recently in his area in Kendall.
>
> **Q.     Did you consider calling him?**
>
> **A.     Yes, but obviously he moved forward to the EEOC and said that we were discriminatory against him.** He would have had his opportunity of working for us. Christopher was out of work for maybe a year or more and we called Chris and let Chris know, hey, we have an opening, are you still unemployed? And he said, yes, I would like to take the opportunity. And Chris is now working for us at that post in Kendall. We also called another of our guards and he said he was already working. So that was it.

**Q.     So why didn't you call Mr. Tarud Saieh?**

**A.     Because he was already filing for the EEOC. And we didn't know that we could be in contact with him to offer him the job.** And the last time I researched, I saw him on the Internet with another job. So I don't think he would have accepted a position with us. We didn't have any ill means or will against him so.

Deposition of Liddy Reynolds (DE# 22-4 at 16, 1/15/14) (emphasis added).

In its reply, the EEOC also cites to Mr. Bosque's deposition testimony as evidence that FCSS' actions were retaliatory. EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 8, 4/28/14). During his deposition, Mr. Bosque testified as follows:

Q.     It's a walking post or a vehicle post?

A.     It's a vehicle post.

**Q.     Was Mr. Tarud Saieh considered for that post?**

**A.     No, he was not.**

Q.     Why not?

**A.     Because I just got that post recently and for the fact that we were in the lawsuit. I don't know if I'm allowed to contact him or not.** So once this EEOC thing started – because that's a post I would have considered him for.

Q.     Is there something unique about that post that you believe he would have been able to do the work?

A.     Well, if I'm ordered by the EEOC to put him to work, then that's the one that I would consider him for because it's a driving post. There is no backing up, there are no dead end streets, it's just going in circles around the building.

But, again, I still feel that I would still think that he cannot perform what other guards could do if something were to happen.

36

Deposition of German Bosque (DE# 22-3 at 13, 1/15/14) (emphasis added).

Construing the facts in the light most favorable to FCSS, as the Court is required to do, there are genuine issues of material fact concerning whether there was a causal connection between Mr. Tarud-saieh's EEOC charge of discrimination/lawsuit and FCSS' failure to assign Mr. Tarud-saieh to another post. The Eleventh Circuit has stated that "[d]irect evidence of discrimination is evidence which reflects a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee and that, if believed, proves the existence of a fact without inference or presumption." Hamilton v. Southland Christian School, Inc., 80 F.3d 1316, 1320 (11th Cir. 2012) (internal quotation marks and citation omitted) (Title VII case). Ms. Reynold's and Mr. Bosque's deposition testimony falls short of this exacting standard. Both Ms. Reynolds and Mr. Bosque testified that because of the EEOC charge they believed they were not allowed to contact Mr. Tarud-saieh. Based on these statements the Court cannot find retaliatory intent without an inference. Therefore, this deposition testimony is not direct evidence of retaliation against Mr. Tarud-saieh.

Here, a reasonable jury could determine that FCSS did not offer Mr. Tarud-saieh a different job position based on its mistaken belief that it was prohibited from contacting Mr. Tarud-saieh after he initiated proceedings with the EEOC and not for any retaliatory reason. Thus, whether there was a causal link between the adverse action and Mr. Tarud-saieh's protected expression should be determined by a jury.

### 3.    FCSS' Affirmative Defenses

Finally, the EEOC seeks summary judgment on FCSS' affirmative defenses of

failure to engage in good faith conciliation prior to filing the instant action and third party

liability. See EEOC's Motion for Summary Judgment (DE# 22 at 5, 1/15/14). The Court

will address these affirmative defenses in turn.

### a. Failure to Conciliate in Good Faith

The applicable statute provides that:

> If within thirty days after a charge is filed with the Commission or within
> thirty days after expiration of any period of reference under subsection (c)
> or (d) of this section, the Commission has been unable to secure from the
> respondent a conciliation agreement acceptable to the Commission, the
> Commission may bring a civil action against any respondent not a
> government, governmental agency, or political subdivision named in the
> charge.

42 U.S.C. § 2000e-5(f)(1). Moreover, "[i]f the Commission determines after [an]

investigation that there is reasonable cause to believe that the charge is true, the

Commission shall endeavor to eliminate any such alleged unlawful employment

practice by informal methods of conference, conciliation, and persuasion." Id. at §

2000e-5(b).

In the instant case, FCSS asserts the failure to seek conciliation in good faith as

an affirmative defense. See Defendant's Answer and Affirmative Defenses to Plaintiff's

Complaint (DE# 9 at 5, 3/28/13). The EEOC raises two arguments with respect to the

conciliation affirmative defense: (1) the failure to conciliate in good faith is not an

affirmative defense and (2) the EEOC conciliated in good faith. FCSS does not address

the first argument. With respect to the second argument, FCSS argues that the EEOC

did not engage in conciliation in good faith, as discussed below. Defendant's Response

and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment

(DE# 32 at 6-8, 2/18/14).

The Court does not need to resolve the issue of whether failure to conciliate in good faith is an actual affirmative defense, because the EEOC has shown that it engaged in good faith conciliation prior to filing the instant action and is entitled to summary judgment on this issue. The EEOC argues that in order to show good faith conciliation, it must have: "(1) outline[d] to the employer the reasonable cause for its belief that Title VII has been violated; (2) offer[ed] an opportunity for voluntary compliance; and (3) respond[ed] in a reasonable and flexible manner to the reasonable attitudes of the employer." EEOC's Motion for Summary Judgment (DE# 22 at 23, 1/15/14) (citing EEOC v. Asplundh Tree Expert Co., 340 F.3d 1256, 1259 (11th 2003)).

FCSS does not dispute that these are the elements the EEOC must show to satisfy the requirements of conciliation. See Defendant's Response and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32 at 7, 2/18/14) (citing the same elements of Asplundh, 340 F.3d at 1259). Rather, FCSS maintains that the EEOC did not meet its obligation to conciliate because when it initially issued its cause determination, it failed to attach a proposed conciliation agreement, imposed a deadline of September 24, 2012 to respond to a proposed conciliation agreement that was not attached and sent a notice to the defendant before the September 24, 2012 deadline stating that conciliation had failed. Id. at 6. Moreover, FCSS argues that "the EEOC did not respond at all to [FCSS]'s concerns nor did it make any reasonable effort to conciliate this matter before filing suit." Id. at 7.

FCSS does not dispute that "on October 2, 2012 a conciliation proposal was faxed to [it]." Defendant's Response and Memorandum of Law in Opposition to Plaintiff's Motion for Summary Judgment (DE# 32 at 6, 2/18/14). However, FCSS takes

39

issue with the contents of the proposed conciliation agreement. FCSS states that it was "a boilerplate document" which contained the name of an individual who does not work for FCSS and the proposed conciliation agreement did not address a concern raised by FCSS in a letter dated September 20, 2012.[12] Id. at 6-7. FCSS further notes that the EEOC made no additional attempt to contact the defendant regarding conciliation. Id. at 7.

The EEOC acknowledges that its "initial conciliation attempts were not perfect," but nonetheless argues that it "corrected any error by reopening the conciliation process and sending a proposed conciliation agreement on October 2, 2012." EEOC's Reply in Support of Motion for Summary Judgment (DE# 39 at 9, 4/28/14). The EEOC further notes that: (1) its "conciliation proposal requested specific injunctive relief, and outlined the types of damages [it] was seeking as part of any conciliation agreement;" (2) it provided FCSS with additional time to respond to the proposed conciliation agreement on October 18, 2012 "warn[ing] FCSS that [the] failure to respond would result in [the] EEOC failing conciliation" and "provid[ing] FCSS with contact information so that FCSS could raise any questions or concerns" and (3) waited until November 26, 2012 to fail conciliation. Id.

_____

[12] FCSS states summarily that the proposed conciliation agreement did not address any of FCSS' concerns raised in the September 20, 2012 letter. FCSS fails to identify with any specificity which concerns were raised in its September 20, 2012 letter but were not addressed by the proposed conciliation agreement. As the party opposing summary judgment on its affirmative defense, FCSS has the burden of raising arguments in sufficient detail. Moreover, to the extent that the September 20, 2012 letter raised the concern that returning Mr. Tarud-saieh to his position as a security guard would expose FCSS to liability from third-parties, the proposed conciliation agreement did not ask FCSS to reinstate Mr. Tarud-saieh. Therefore, the undersigned is unpersuaded by this argument.

The Court finds that the EEOC has shown that it is entitled to summary judgment on the conciliation issue. The instant case is distinguishable from Asplundh where the EEOC's case was dismissed for failure to conciliate in good faith. Asplundh, 340 F.3d at 1259. In Asplundh, the EEOC took three years to issue its [l]etter of [d]etermination and one week later provided the defendant with a "proposed, nation-wide [c]onciliation [a]greement, which [only] provided twelve days for" the defendant's counsel to accept, reject or submit a counterproposal to the conciliation agreement. Id. at 1259-60. Additionally, the EEOC in Asplundh never communicated to the defendant a theory of liability for the alleged conduct of a non-employee, did not respond to the defendant's request for "a reasonable extension of time" and "the very next day . . . sent another letter . . . terminating conciliation and announcing its intent to sue." Id. at 1260. Thirteen days later, the EEOC filed a lawsuit. Id. This case is also distinguishable from High Speed Enter., Inc., where the district court concluded that the EEOC failed to conciliate in good faith because it "refused to provide any basis for its damages calculations despite Defendant's repeated requests." EEOC v. High Speed Enter., Inc., No. CV-08-017489-PHX-ROS, 2010 WL 8367452, at *5 (D. Ariz. Sept. 30, 2010) (emphasis added).

Here, the EEOC has shown good faith conciliation as a matter of law and is entitled to summary judgment on this issue. Although the EEOC initially failed to attach a proposed conciliation agreement, it corrected this error as outlined above and allowed FCSS additional time to participate in conciliation. Moreover, there is no evidence that FCSS made any attempt to conciliate or otherwise engage in settlement discussions between October 2, 2012 and November 26, 2012. Based on these undisputed facts,

the undersigned concludes that the EEOC engaged in good faith conciliation.

Accordingly, the EEOC is entitled to summary judgment on this issue.

> **b.      Third Party Liability**

FCSS failed to raise any argument in support of its third party liability affirmative

defense. As such, the Court will deem this affirmative defense abandoned. See

Resolution Trust Corp. v. Dunmar Corp., 43 F.3d 587, 599 (11th Cir. 1995) ( "There is

no burden upon the district court to distill every potential argument that could be made

based upon the materials before it on summary judgment. Rather, the onus is upon the

parties to formulate arguments; grounds alleged in the complaint but not relied upon in

summary judgment are deemed abandoned.") (internal citations omitted).

<u>CONCLUSION</u>

In sum, viewing all the evidence in the light most favorable to FCSS, there are

genuine issues of material fact that preclude summary judgment on the EEOC's

disability discrimination and retaliation claims. These disputed issue of fact must be

resolved by a jury. Accordingly, it is

ORDERED AND ADJUDGED that the EEOC's Motion for Summary Judgment

(DE# 22, 1/15/14) is **GRANTED in part and DENIED in part**. The EEOC is entitled to

summary judgment on FCSS' failure to conciliate in good faith and FCSS' third party

liability affirmative defense is deemed abandoned. The EEOC's claims of discrimination

and retaliation shall proceed to trial.

DONE AND ORDERED in Chambers at Miami, Florida, this **24th** day of

September, 2014.

_____

JOHN J. O'SULLIVAN
UNITED STATES MAGISTRATE JUDGE

Copies provided:
All counsel on record